number 3 17 07 94. People of the state of Illinois versus Randy Boyer. Okay, Council. Uh, Justice Schmidt is on this case but is unable to be on the zoom meeting. But he will have the benefit of your oral argument through the audio, which you can listen to and also the benefit of the briefs that he's a fully participating member of this panel on this case. But he just is unable at this time to be part of the zoom meeting. Okay, very good. Um, for the appellate, we made Mr Burrell. You may proceed. Please state your name for the record. Okay. Good morning, Your Honors. Good morning, Council. I'm Steve barrel with the offices that appellate defender third district for the petitioner Randy Royer. And I want to thank your honors for being able to accommodate this or argument today. You're welcome. May it please the court. I will be asking your honors today to find that Randy Royer's 60 year de facto life sentence is unconstitutional under the Eighth Amendment to the U. S. Constitution or alternatively, under the broader provisions of the proportionate penalties clause of the Illinois Constitution. A lot of things have changed since the de facto life sentence was imposed on Randy Royer in the year 2000. We've had new scientific information about juvenile development that has become available on. We've had changing community ideas about when it's okay to essentially lock up a juvenile forever and throw away the key. Um, and that has led the Supreme Court Supreme Courts to hold that the punishment of life without parole or its equivalent is only to be imposed upon the rarest of juvenile offenders that is permanently incorrigible, essentially the worst of the worst juvenile offenders. Now, that's a requirement, of course, that applies retroactively. So the was not aware of that requirement. If the judge was aware of that requirement, plus the additional requirements, uh, that Miller places on considering certain aspects of youth in mitigation before imposing a de facto life sentence, the judge would not have imposed a de facto life sentence on Randy Royer. Indeed, Randy Royer is not close to being among the worst of juvenile offenders of the worst of juvenile murders. Um, he did commit a murder at the age of 17. Um, however, the child, the sentencing judge at the time in 2000 that he was sent Sam found that he was genuinely remorseful for what he did. Moreover, he actually drove the victim to the hospital. Um, and these these two things alone under today's way of thinking would be enough to show that this is not someone who was permanently incorrigible, who's the worst of the worst juvenile offender. He's someone who just just by those things, remorse on what he did driving the hospital would suggest that he certainly is someone who could rehabilitate over the course of 40 40 year time period. The U. S. Supreme Court. Uh, in addition to that finding, of course, that the judge didn't know about. Um, there's also a requirement now that new mitigating factors be considered. Now, at the time, uh, those were not part of Illinois statutes that those factors be considered. So, for example, it was created by the, uh, in Miller versus Alabama. Certain mitigating factors of youth youth and its attendant circumstances had to be considered before someone could be found permanently incorrigible. And so the characteristic impulsivity and recklessness of youth and immaturity of youth has to be considered in mitigation. A juvenile's home environment on the negative influences of peers and family have to be considered in mitigation. And these were things that at the time could have potentially been considered, um, an aggravation under the Illinois statutes of the time. Illinois law codified the requirement of Miller Miller in 2015. So essentially, there's been this qualitative change in the analysis that must be done. And again, looking at these factors, there was there's some strong mitigation here that would not have that would have led the judge not imposed a de facto life sentence on Randy. I'm confused, Mr. Real. You said something about prior. These could be through the prior case law. Obviously, um, the home environment and that sort of thing. Juvenile having a troubled home environment was something that wasn't specifically listed, of course, among the factors in mitigation. And there's case law from the Illinois Supreme Court that said that if it suggests future dangerousness, it was something that could be considered in aggravation rather than mitigation. Or it's something a judge could have just really considered. Uh, look through the documents and the presents investigation report to, um, think that it makes much of a difference at all. Because again, you're not looking at the worst. The worst kind of situation. Um, the analysis would be different. So, um, so are you saying it was an error by the trial judge in this instance to at that time of sentencing to highlight those factors, which I believe you did. Did they not? Did he not address those factors? So what the trial judge did in terms of the factors that the trial judge didn't say anything about impulse, specifically about impulsivity or immaturity. And, um, so whether it's air, I mean, at the time, what did he say about home environment and etcetera? That's what I'm asking about. Okay, so yes, about that. The judge made a remark about, um, violence and anger or something like that being well known in the home. It's unclear exactly what the judge was referring to there. But the judge said that and right after the judge said the judge said and further factors in aggravation are etcetera, etcetera. So it appeared the judge was considering it in aggravation, and that could that could have made a difference here because that was a really important factor in ready situation. His he was born, unfortunately, to parents who are both drug addicts. Well, I think we're familiar with the facts, but you're saying that would be air under today's law to to put those on the aggravation side of the column. Is that correct? Yes, I think Miller and on the new statutes that Illinois put into effect say that and essentially the reason for this is that well, not a juvenile's fault. Well, we know the reason it's not hard to figure out, but you're we're looking at what the trial judge did in this instance, and you're saying it's a reasonable, uh, inference that he was considering those is aggravating factors under under prior sentencing procedures. Is that correct? Yes. Okay. And you're saying that in the change under Miller and its progeny, those factors are to be considered in terms of mitigation, correct? Yes, that's correct. And that's because of the new developmental neuro neuro neurological development science that that's about and the new theories we have as to behavior, correct? Yes. Okay. All right. They're not really new, except to the court. Well, the new neurological studies that show other than speculation about behavior, but show physiological changes, I think is no. Yes, I don't agree. Well, that was definitely new to the court. Well, I'd say it's new to the science that we're talking in terms of brain development, which is clearly new information. Yes. And either way, the court didn't know, you know, about the new mitigating factors, essentially, and didn't know that the required the required finding and that sort of thing. But this has to be a permanently incorrigible worst of the worst kind of offender. So we're we're asking this this court to find that, given all the evidence in the record of those mitigating factors and showing that Randy was not a permanently incorrigible worst of the worst offender, that the court could evaluate differently. And resentencing should be in order. Did you reference Malvo case? No. Oh, yes. Okay. So I'm not sure if you're familiar with what's happened in that case. Well, it's dismissed at the Supreme Court level. That's correct. Okay, so it's because of its Maryland and Virginia are reassessing their under Miller, those factors, right? Yes. Yes. I believe the those states granted parole hearings to all defendants, essentially. And then the case was dismissed. So they provided them a meaningful opportunity for release. And that is a way to to cure Miller violation, resentencing, potentially some other meaningful opportunity for release. Very good. You'll have some time. You're finished, then. All right. Okay. Yes. You have time in reply. Thank you. Thanks, Mr. Mr. Otto. You may proceed. Good morning, Your Honor's Council. Thomas Rado, state's transparent prosecutor on behalf of the people. This case is really based upon the factors that are set forth in people versus Holman, the Supreme Court case. In that case, these course, worth five factors that need to be considered when looking at the cold record of when the defendant was originally sentenced. I'm sure the court is familiar with the factors, but they are one the juvenile defense chronological age, as well as any evidence of immaturity, impetuosity, failure to appreciate the risks and consequences to the juvenile defendants, family and home environment. Three, the juvenile defendants degree of participation in the homicide, many evidence of familial or peer pressure that may have affected him for the juvenile defendants and competence, including his ability to deal with police officers, prosecutors, and this incapacity to assist his own attorneys and five, the juvenile defendants prospects for rehabilitation. And Holman, the Illinois Supreme Court reviewed what the trial court at the time knew. And they stated that the trial court knew the defendant was 17 at the time of the offense. The prosecutor and defense attorney highlighted the defendants age in their arguments at the sentencing hearing. The PSI and psychological reports set forth insight into the mentality of the defendant. The PSI also included information about the defendant's family. PSI alerted the trial court as to the susceptibility of peer pressure, as well as his low intelligence and possible brain damage from a head injury. There's nothing indicating, however, that he was otherwise incompetent or unable to assist his attorneys. There was also indications that there was no pre deliction for rehabilitation. So using Holman as the model, we look at what was evidence presented and argued in this case of sentencing. And we know that the first factor, the trial court was well aware of the age of the defendant. It was not only in the PSI, but it was highlighted during the arguments of parties. PSI indicated he was just 17 days short of being 18 years of age. It did not appear that he completed high school, but he was, by all accounts, an above average student. So unlike Holman, he was not low intelligence. He also, second factor, the juvenile's family at home environment, that evidence was presented through the aunt who testified that defendant's mother left the family and she eventually died of AIDS. Another woman who lived with the father and defendant as he was growing up also died of AIDS. The father had HIV. The father argued with his paramour in front of the defendant, but did spank him. The father was often drunk and passed out. Also, the defendant admitted to using alcohol, beginning at age 12, marijuana at age 11, and cocaine and LSD at age 13. The third factor, participation in the homicide and evidence of peer pressure or familial pressure. There's only evidence of any sort of peer pressure was the defendant being needled by a couple of friends about the fact that his ex-girlfriend, Jennifer Tappan, was with the victim, Timothy Dildine. There was no indication that they said, oh, you should go out and murder Dildine. So the only person responsible for this brutal murder, and it was indeed brutal, the indication was that this, the mental experts who testified said that this was among the most severe injuries that he had, one of them said he had seen in 20 years. The other one said, compared it to a fall from a seven-story building. So the defendant is the only one responsible. As far as his incompetence, his inability to deal with police officers, prosecutors, etc., ability to assist his attorneys, there's no indication that he was incompetent in any way. He cooperated with his attorneys, he discussed with the police before, during, and after what occurred. Therefore, that evidence was presented. And as far as prospects for rehabilitation, the argument, as the state presented below, there was a history of delinquency starting in 1993. He was found delinquent for residential burglary, criminal damage to property, felony theft, misdemeanor theft, and battery. He then was sentenced to one year term of probation, which there was a petition revoked because he was alleged to have committed aggravated assault and reckless conduct. Subsequently, in 96, he was charged with burglary and criminal damage to property, found delinquent, was given one year probation, and then four months later, he was petitioned, revoked, was filed, allegedly committed domestic battery. So again, crimes of violence. He was found to have violated his probation. And after a 30-day sentence in the youth home, he was, his probation was terminated unsuccessfully. Then we have what Francisco Rodriguez, in which Rodriguez testified that the defendant approached him dating Jennifer Tappan, and then proceeded to hit him in the head with a baseball bat. He also smashed him in his windshield. The defendant was charged in that offense and admitted to his behavior to the police officer. The later that with a baseball bat after accusing Greider of dating Jennifer Tappan. So that brings us to the offense in question, in which the defendant went to looking for Jennifer Tappan and Timothy Dildine onto the beach. He carried a baseball bat with him. He went, he was confronted by Annette Rexroad, who tried to stop him. She, he pushed her away. She grabbed the bat. He pulled the bat back. He went, stood over the sleeping Dildine and bashed his head in at least three to four to five times. This was found in this court in the original decision to, the offense was clearly brutal and heinous, given the evidence that defendants attacked Timothy while he was sleeping, repeatedly struck him with a baseball bat, and inflicted injuries of severity rarely seen by medical professionals who testified. Based on this evidence, we cannot say the sentence is manifestly disproportionate to the nature of the offense. This is just going up. What, what indication do we have in the record that Judge Howlerich considered the Miller factors? The Miller factors clearly were not set forth at the time because this was in 2000. Yet Holman speaks to the fact that did the judge have the opportunity to consider all those factors? And looking at the evidence, and if we put this case and the factors that were set forth in the Holman decision into this case, it's the same type of information that was available and considered by the judge. As far as arguments were gone. We also know that the, the arguments by the parties were focused upon his rehabilitative potential. The state argued that there was no real rehabilitative potential in the case, given the pre-sentence investigation, that fact that he received behavioral counseling, drug counseling, nothing worse. I'll point out that he was. So, so while the specific Miller factors could not possibly have been discussed by the trial judge, they were at least available and generally considered by the trial judge as set forth in Holman. Miller is retroactive. And the requirement is that the trial court actively consider and take findings with regard to the Miller factors. So doesn't that suggest that there should be a new sentencing hearing? Well, not on, respectfully, Your Honor, not under Holman, because it's the same factors that were found by by the Illinois Supreme Court to have been available to the trial judge in that case, the court did not find that a new sentencing hearing had to be take place. Therefore, applying Holman to this case should be the same result. The trial judge had considered in the arguments by the parties that they knew that this would potentially be a sentence that would be for the rest of his life. The state recognized that on page 803 of the record. The defense counsel argued that in page 804 of the trial judge stated that factors I find in mitigation are remorse and youth. However, I find that the fact that he was a young man does not mitigate my estimation sufficiently to prevent me from sentencing him severely. The evidence here shows the violence of anger, violence and anger was well known and used in the family. The incident question was done in the court's opinion in a cold, calculated manner. He picked up a bat and went looking for someone. It's that point that the trial judge says factors further in aggravation are they attacked a man that was sound asleep with no offer and no ability to defend himself. So there is not a direct line necessarily between the violence and anger and factors and further aggravation. I think there's something that is in between that. So does Buffer have any bearing on this case? Buffer only has the bearing that de facto life sentence of 40 years is the point of demarcation of the line drawn. So this defendant has six years so clearly it's a de facto life sentence. I'm not sure that the court ruled Holman because it said that the court did not consider youth at the time. Well, if you look at what the trial judge said at the time, this is at paragraph five from Buffer, it only referred to youth in the context of limited extent the financial impact of no indication in Buffer as far as what the arguments were of the parties, what other evidence was presented. So the case is basically silent. And it did not overrule Holman. It discussed Holman, it said that under, in fact, under Holman and the Miller and the other cases that it had to be reversed. Also, I point out that in Buffer, the minimum sentence available to the trial court was a 20-year minimum plus a 25-year mandatory add-on because the defendant was found to have pulled the, used the firearm in the commission of the murder. Therefore, the trial judge had no discretion in imposing at the very least, a de facto life sentence. So while the court does not discuss that, it certainly is a factor in relevancy as far as Buffer versus Holman. So, as far as the proportion of penalties argument goes, I would also point out to the court that the defendant had a proportion of penalties argument in his original sentence, or original appeal, and therefore, raised to the conscience should apply in that case. However, even if you'd considered whether or not this was a type of offense that would shock or sentence that would shock the moral nature of this offense, this sentence would not violate the proportion of penalties clause. Also, I would point out that the cases that are relied upon, House 2, essentially, and Offman, have both been allowed by the Illinois Supreme Court as petitions for leave to appeal. And therefore, if this court is going to consider the proportion of penalties argument based on those cases, it may want to wait until the court has ruled in those cases. Thus, for all these reasons, we would ask that this court affirm the dismissal of the post-conviction petition. If there are no other questions, the state would rest, I guess. Okay, I don't believe there are. Mr. Virrell, you may reply. Okay. Well, I think if we read the paragraph in buffer that the state was referring to, we can really see that the court considered everything that needed to be considered back at the time that the buffer sentence was imposed. And that could be similar in this particular case, but that's not enough anymore. And that's why there was a problem with the court clearly said that the sentencing judge did not consider euthanasia tenant circumstances and buffer that was part of its holding, despite the argument of counsel opposing counsel. And clearly, the buffer judge considered everything that you need to including the potential for rehabilitation, specifically mentioning that the defendant's age, all those things. Now, the judge didn't make findings as to all of the Miller factors. That's the same as it is here. The judge didn't even mention impulsivity, even though there's 15 references to the PSI impulsivity in this case. And so buffer seems to be in tension with Holman. And it's the more recent case, it seems to be indicating that generally, it's not going to be possible in most situations for a judge to comply with this in the past unless you've got a record that clearly shows that they can they consider each of these factors as mitigating factors and not aggravating factors. But another thing about Holman is it's very distinguishable from this case. I mean, the the idea that there's going to be a life sentence in that case was pretty much a foregone conclusion, because that defendant had confessed to murdering eight people. He was convicted of two other murders in addition to the murder that he got the life sentence for in that particular appeal. It's not even close to the factual circumstances of this particular case. And you know, the state is tries to talk about to a certain extent, being a brutal and heinous offense and that sort of thing. But the Supreme Court has specifically said that even for even juveniles who commit heinous heinous crimes, are almost always the vast majority of them can be rehabilitated in time. And a factual life sentence is not appropriate for the vast majority of them. So that in the end, has very small weight. And the fact that that as the state mentions, the trial judge was focused in on that, as opposed to the potential for rehabilitation is a problem now. But okay, then now, it doesn't doesn't fly. And additionally, the state sort of talked about his Mr. Roars past history. Well, there are several things with that. I mean, first of all, he never been to the juvenile department Department of juvenile justice. He never received a sentence of that. These two prior incidents with a bat, one of them wasn't even reported to the state. The other one was a situation where he was convicted, he was charged with battery, not attempted murder, not aggravated battery, battery. Okay, so his history isn't quite what the state is making out to be. And the state also, even though obviously, your honors are familiar with the facts sort of extensively covered some of the facts of this case, I think maybe there's different angle to look at them It could certainly be seen differently by a judge and a new sentencing hearing. You know, the record shows that we're drug addicted parents and step parents treated with a combination of physical abuse and neglect. There's a there's a letter in the PSI that says we're never had a chance of life from the day he was born. His life was a living hell. He unfortunately learned these bad behaviors, engaged in drug abuse, learned to as a kid. He's a child. He can't escape that environment, unfortunately. And that's one of the things that Miller recognized was hugely important. So he developed mental health issues in this chaotic environment that he's living in. He became he developed some issues with impulsivity. And if we look at the night of the offense, or what happened? Well, like other people involved in this situation, he's up all night partying, drinking alcohol, and And then he does something that's obviously terrible. No, there's no, it's a terrible act that he does. But it's the sort of thing that maybe a hothead 17 year old Randy Royer would do, and a 57 year old Randy Royer would not do, which is to go attack his friend out of jealousy because his friends with his ex girlfriend. Now, if your honors could just give him a chance here. You know, I think it's a state it's a state's burden to show that he's permanently incorrigible. But he would be eager to have a chance to show that he has changed here. And if we look at the record, if your honors give him one chance, he can show that I'm confident that he can show that the post he would impress the sentencing judge just like he did the post conviction judge who said that he's a model decorum complimented him on his exemplary demeanor. We've got DLC records in there that show no disciplinary fractions. Mr. Burrell, the red light has come on. Yes, I'm sorry. My time is wrong. Your honors. So if there are no further questions, I would ask that you, uh, order, uh, a new sensing hearing or in the alternative apply the parole statute retroactively, uh, to my client. So we can benefit from parole hearings like people who are updated up to age 21, uh, currently can, if there's something hearing was after June 1st, 2019. Okay. Uh, I don't believe there are any further questions. Uh, we'd like to thank Mr. Burrell, Mr. Rado for your fine arguments in this matter this morning, and it will be taken under advisement. This case and written disposition shall issue. And I believe at this time, uh, you will be released from the meeting and the court will will resume.